# Targeted Airstrikes Against the Islamic State of Iraq and the Levant

The President had the constitutional authority to order targeted airstrikes in Iraq against the Islamic State of Iraq and the Levant without prior congressional authorization.

The President had reasonably determined that these military operations would further sufficiently important national interests. A combination of three relevant national interests—protecting American lives and property; assisting an ally or strategic partner at its request; and protecting endangered populations against humanitarian atrocities, including possible genocide—supported the President's constitutional authority to order the operations without prior congressional authorization.

The anticipated nature, scope, and duration of the military operations did not rise to the level of a "war" within the meaning of the Declaration of War Clause.

December 30, 2014

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

On August 8, 2014, United States Armed Forces commenced targeted airstrikes in Iraq against the terrorist group the Islamic State of Iraq and the Levant ("ISIL"). Before the strikes began, our Office advised you that the President had the constitutional authority to order these military operations because he had reasonably determined that they would further sufficiently important national interests, and because their anticipated nature, scope, and duration were sufficiently limited that prior congressional approval was not constitutionally required. This memorandum memorializes and explains the basis for our advice.[1]

---

[1] This advice was provided before the President decided to rely on statutory authority for military operations against ISIL. We accordingly do not address in this opinion whether the targeted military actions discussed herein were authorized by any statute. We further note that on September 10, 2014, after the advice memorialized in this opinion had already been provided, the President announced a new "comprehensive and sustained counterterrorism strategy" to address the threat posed by ISIL that, among other things, called for a "systematic campaign of airstrikes" against the organization in Iraq and, if necessary, Syria. Office of the Press Secretary, The White House, Statement by President Obama on ISIL (Sept. 10, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/09/10/statement-president-isil-1. You have not asked us to consider in this opinion, and we do not address, the President's authority to implement this new strategy. We also do not consider whether the discrete military operations discussed in this opinion would

## I.

The conflict that led to the airstrikes discussed in this opinion has its origins in the most recent Iraq War. In 2002, in response to concerns that Saddam Hussein's regime might be developing and stockpiling weapons of mass destruction and aiding and harboring terrorists, Congress authorized the President to use military force against the threat posed by Iraq. *See* Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 ("Iraq AUMF"); Raymond W. Copson, Cong. Research Serv., RL31715, *Iraq War: Background and Issues Overview* 1–2 (Apr. 22, 2003) ("*Iraq War: Background and Issues Overview*"). On March 19, 2003, after diplomatic efforts to resolve these concerns failed, the United States began aerial attacks in Iraq. *See Iraq War: Background and Issues Overview* at 4. U.S. and British ground forces entered Iraq the next day, *id.*, and several weeks later, Saddam Hussein's regime fell, Kenneth Katzman, Cong. Research Serv., RS21968, *Iraq: Politics, Governance, and Human Rights* 1 (Aug. 12, 2014) ("*Iraq: Politics, Governance, and Human Rights*"). After the fall of the regime, a new Iraqi government was formed, and U.S. and other coalition forces remained in Iraq to help secure and stabilize the country. *See id.* Over the next few years, however, as sectarian divisions in Iraqi society deepened, *see id.* at 4, the terrorist group Al-Qaeda in Iraq—Al-Qaeda's affiliate in Iraq and the primary source of armed opposition to the new Iraqi government and U.S. forces—intensified its operations and expanded its reach, *see* Kenneth Katzman, Cong. Research Serv., RL32217, *Al Qaeda in Iraq: Assessment and Outside Links* 1, 10–11 (Aug. 15, 2008); Bradley Graham, *Zarqawi "Hijacked" Insurgency*, Wash. Post, Sept. 28, 2005, at A17. In 2006, Al-Qaeda in Iraq renamed itself the Islamic State of Iraq ("ISI"). *See* Kenneth Katzman et al., Cong. Research Serv., R43612, *Iraq Crisis and U.S. Policy* 8 (Aug. 8, 2014) ("*Iraq Crisis and U.S. Policy*"). Violence continued to escalate and, by early 2007, had become widespread and severe. *See Nominations Before the Senate Armed Services Committee: Hearings Before the S. Comm. on Armed Servs.*, 110th Cong. 5–8 (2007) (statement of Lt. Gen. David H. Petraeus). The United States

---

have been within the President's constitutional authority if they had been ordered pursuant to the newly announced strategy, rather than for the more limited missions for which they were actually ordered.

responded with a surge of nearly 30,000 troops. *See Iraq: Politics, Governance, and Human Rights* at 4. Over the course of 2007 and 2008, in the wake of the surge, sectarian violence in Iraq dropped dramatically. *See* Stephen Biddle et al., *Testing the Surge: Why Did Violence Decline in Iraq in 2007?*, 37 Int'l Sec. 7 (Summer 2012).

In 2008, the United States and Iraq signed a Strategic Framework Agreement for a Relationship of Friendship and Cooperation Between the United States of America and the Republic of Iraq ("Strategic Framework Agreement" or "Agreement"), which recognized that cooperation between the two countries would "improve and strengthen security and stability in Iraq and the region." Strategic Framework Agreement at 2 (Nov. 17, 2008), https://www.state.gov/documents/organization/122076.pdf. Among its many provisions, the Agreement stated that the United States and Iraq would "continue to foster close cooperation concerning defense and security arrangements without prejudice to Iraqi sovereignty over its land, sea, and air territory." *Id.* at 3. The United States began to reduce its military presence in Iraq in 2009, and in December 2011, the last U.S. troops left the country. *See Iraq: Politics, Governance, and Human Rights* at 8; Tim Arango & Michael S. Schmidt, *Last Convoy of American Troops Leaves Iraq, Marking a War's End*, N.Y. Times, Dec. 19, 2011, at A6. In announcing this withdrawal, President Obama explained that the United States was "moving into a new phase in [its] relationship" with Iraq, "an equal partnership based on mutual interests and mutual respect." Office of the Press Secretary, The White House, Remarks by the President on Ending the War in Iraq (Oct. 21, 2011), https://obamawhitehouse. archives.gov/the-press-office/2011/10/21/remarks-president-ending-war-iraq.

After U.S. military forces had left Iraq in 2011, the long-standing sectarian and ethnic divisions in the country again widened, leading to increased discontent and unrest. *See Iraq: Politics, Governance, and Human Rights* at 15–19. During this period, Sunni extremists, including ISI, gained strength. *See id.* In April 2013, after having expanded into Syria, ISI adopted the name ISIL.[2] *See Iraq Crisis and U.S. Policy* at 8, 11. ISIL

---

[2] ISIL is also sometimes referred to as the "Islamic State of Iraq and Syria," or "ISIS." This opinion refers to the group as "ISIL" hereafter, including in references to the group following its decision to change its name to the "Islamic State." *See infra* p. 86.

soon launched a series of attacks in Iraq. *See id.* at 7–9. In December 2013, aided by Sunni citizens and tribal fighters dissatisfied with the failure of Iraq's Shiite-dominated leadership to create an inclusive government, ISIL attacked the Iraqi cities of Ramadi and Fallujah, ultimately gaining control of Fallujah despite an Iraqi counteroffensive. *See Iraq: Politics, Governance, and Human Rights* at 18. Then, in June 2014, ISIL launched a major offensive in Iraq and, assisted by the widespread surrender and withdrawal of the Iraqi Security Forces ("ISF") and an influx of fighters from Syria, captured Mosul, Iraq's second largest city, and large areas of the provinces of Nineveh and Salahuddin. *See id.* at 19; Rod Nordland, *Sunnis in Iraq Make Some Gains in Fighting in the North and West*, N.Y. Times, June 22, 2014, at A7. ISIL militants thereafter rapidly expanded their control over northwestern areas of Iraq, capturing key cities and attacking Iraq's largest oil refinery. *See Iraq: Politics, Governance, and Human Rights* at 19–20. Within a week of Mosul's fall, ISIL reached the outskirts of Baquabah, thirty-eight miles from Baghdad, prompting fear that the capital too would fall. *See Iraq Crisis and U.S. Policy* at 1. ISIL militants also advanced toward the Haditha Dam, situated about 120 miles northwest of Baghdad on the Euphrates River, raising the prospect of catastrophic flooding if the dam were to fail. *See* Alissa J. Rubin & Rod Nordland, *As Calls for New Iraqi Government Grow, Militants Advance Toward Strategic Dam*, N.Y. Times, June 25, 2014, at A10. In the course of its advance, ISIL looted banks of millions of dollars, seized a substantial amount of U.S.-supplied military equipment, and freed prisoners. *See Iraq Crisis and U.S. Policy* at 1. Its tactics were brutal: it executed innocent civilians, performed mass executions of ISF members, kidnapped and raped women and children, and displaced hundreds of thousands of Iraqis from their homes. *See* Office of the High Commissioner for Human Rights & U.N. Assistance Mission for Iraq (UNAMI) Human Rights Office, *Report on the Protection of Civilians in the Non-International Armed Conflict in Iraq: 5 June–5 July 2014*, at 7–13, https://www.ohchr.org/Documents/Countries/IQ/UNAMI_OHCHR_POC%20Report_FINAL_18July2014A.pdf.

In remarks on June 19, 2014, President Obama declared ISIL "a threat to the Iraqi people, to the region, and to U.S. interests." Office of the Press Secretary, The White House, Remarks by the President on the Situation in Iraq (June 19, 2014), https://obamawhitehouse.archives.gov/

the-press-office/2014/06/19/remarks-president-situation-iraq. He stated that "[i]t is in [the] national security interests [of the United States] not to see an all-out civil war inside of Iraq," and to "mak[e] sure that we don't have a safe haven" in Iraq "that continues to grow for ISIL and other extremist jihadist groups who could use that as a base of operations for planning and targeting ourselves, our personnel overseas, and eventually the homeland." *Id.* The President then announced that he had positioned additional U.S. military assets in the region and "w[ould] be prepared to take targeted and precise military action" if and when he determined that "the situation on the ground require[d] it." *Id.* In light of the growing threat from ISIL, the President also dispatched U.S. military personnel to Iraq three times in June to, among other things, provide support and security for U.S. embassy personnel in Baghdad and establish joint operations centers with Iraqi forces.[3]

On June 29, ISIL changed its name to the "Islamic State" and declared that it had established an Islamic "caliphate" extending from the Aleppo province in Syria to the Diyala province in Iraq. *Iraq Crisis and U.S.*

---

[3] *See* Office of the Press Secretary, The White House, Text of a Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (June 16, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/06/16/text-letter-president-speaker-house-representatives-and-president-pro-te (authorizing the deployment of 275 troops "to provide support and security for U.S. personnel and the U.S. Embassy in Baghdad"); Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Letter Regarding Iraq (June 26, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/06/26/letter-president-war-powers-resolution-letter-regarding-iraq (authorizing the deployment of 300 additional troops "to assess how we can best train, advise, and support Iraqi security forces and to establish joint operations centers with Iraqi security forces to share intelligence and coordinate planning to confront the threat posed by ISIL"); Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Letter Regarding Iraq (June 30, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/06/30/letter-president-war-powers-resolution-letter-regarding-iraq (authorizing the deployment of 200 additional troops "to reinforce security at the U.S. Embassy, its support facilities, and the Baghdad International Airport"). In early September, the President authorized the deployment of an additional 350 U.S. military personnel "to provide support and security for U.S. personnel and the U.S. Embassy in Baghdad." Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Regarding Iraq (Sept. 5, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/09/05/letter-president-war-powers-resolution-regarding-iraq.

*Policy* at 8. The declaration named ISIL's leader Abu Bakr al Baghdadi as Imam and "[C]aliph." *Id.* In territories they controlled, ISIL militants intensified a campaign of persecution against non-Sunni religious groups and ethnic minorities, including Shiites, Christians, and Yezidis, an ancient and long-persecuted religious sect. *See* Alissa J. Rubin, *ISIS Expels Last Iraqi Christians from Mosul*, N.Y. Times, July 19, 2014, at A4; Loveday Morris, *Islamic State Forces Take an Iraqi Town*, Wash. Post, Aug. 4, 2014, at A9; Press Statement, Office of Press Relations, U.S. Dep't of State, ISIL Claims Massacre in Tikrit (June 15, 2014) ("State Department June 15 Press Statement"), https://2009-2017.state.gov/r/pa/prs/ps/2014/06/227605.htm. Journalists reported that when ISIL militants swept through Sinjar, a town in northwestern Iraq with a large Yezidi population, they "set about their method of conquest, which is as familiar as it is brutal: They destroyed a Shiite shrine, executed resisters, overran local security forces and hoisted the black flag of [ISIL] above government buildings." Tim Arango, *Sunni Extremists in Iraq Seize 3 Towns From Kurds and Threaten Major Dam,* N.Y. Times, Aug. 4, 2014, at A7. Yezidi residents reported witnessing kidnappings and executions of members of their sect. *See id.* Tens of thousands of residents fled to the northern Kurdish region of Iraq, while thousands of others, largely from the Yezidi community, sought refuge on Mount Sinjar, where they were besieged by ISIL militants. *See* Alissa J. Rubin, *For Refugees on Mountain, "No Water, No Nothing,"* N.Y. Times, Aug. 10, 2014, at A1. Those trapped on the mountain confronted a choice between descending into areas controlled by the militants and facing likely death, or remaining on the mountain without sufficient food, water, or medicine. *See* Loveday Morris, *Cornered on Mountain, Minority-Sect Iraqis Are Dying of Thirst*, Wash. Post, Aug. 6, 2014, at A10. The U.N. Special Representative of the Secretary-General for Iraq warned that "[a] humanitarian tragedy [wa]s unfolding in Sinjar." UN News Centre, *UN Warns of "Humanitarian Tragedy" as Militants Seize Town in Northern Iraq* (Aug. 3, 2014); *see also* Security Council, Press Statement on Iraq, U.N. Press Release SC/11509 (Aug. 5, 2014) ("Security Council August 5 Press Release") (expressing "deep concern" about the thousands of Iraqis, many from the Yezidi community, displaced by ISIL and "in urgent need of humanitarian assistance"). Days after the siege on Mount Sinjar began, the U.N. Security Council "call[ed] on the international community to support the Gov-

ernment and people of Iraq and to do all it c[ould] to help alleviate the suffering of the population affected by the current conflict in Iraq." Security Council, Press Statement on Iraq, U.N. Press Release SC/11515 (Aug. 7, 2014) ("Security Council August 7 Press Release").

By early August 2014, ISIL militants had seized control of additional towns in northern Iraq and were advancing towards the city of Erbil, where numerous American diplomats, military advisers, and other citizens were based. *See* Helene Cooper et al., *Obama Allows Airstrikes Against Iraq Rebels*, N.Y. Times, Aug. 8, 2014, at A1; *Iraq: Politics, Governance, and Human Rights* at 19. ISIL militants had also seized control of the Mosul Dam, Iraq's largest, from Kurdish forces. *See* Tim Arango, *Jihadists Rout Kurds in North and Seize Strategic Iraqi Dam*, N.Y. Times, Aug. 8, 2014, at A1 ("*Jihadists Rout Kurds*"). ISIL's seizure of the Mosul Dam raised concerns because, as a 2007 report by the Army Corps of Engineers explained, the Mosul Dam rests on a "very poor" foundation of water-soluble rock and soil and therefore "demand[s] extraordinary engineering measures to maintain" its "structural integrity and operating capability." Julie R. Kelley et al., U.S. Army Corps of Engineers, ERDC TR-07-10, *Geologic Setting of Mosul Dam and Its Engineering Implications* 2 (Sept. 2007) ("*Geologic Setting of Mosul Dam*"). Consistent with that report, the United States had advised Iraq that an extensive grouting program should be continued to "mitigat[e] the risk at Mosul Dam," explaining that "a catastrophic failure" of the dam would "result in flooding along the Tigris River all the way to Baghdad," and, in a worst case scenario, "a flood wave 20 meters [65 feet] deep at the city of Mosul," threatening "significant loss of life and property." Letter for Nouri al-Maliki, Prime Minister, Republic of Iraq, from General David H. Petraeus, U.S. Army, and Ambassador Ryan C. Crocker, United States Embassy, Baghdad (May 3, 2007), *reprinted in* Office of the Special Inspector General for Iraq Reconstruction, *Relief and Reconstruction Funded Work at Mosul Dam*, SIGIR PA-07-105, app. D (Oct. 29, 2007) ("Mosul Dam Letter"). A later article by an Army Corps official estimated that the dam's failure "could lead to as many as 500,000 civilian deaths by inundating the cities of Mosul and Baghdad under water." Amanda Ellison*, An Unprecedented Task*, 63 Int'l Water Power & Dam Construction 50, 50–51 (Sept. 2011).

ISIL militants also continued to battle ISF and allied tribal forces for control of the Haditha Dam. *See Jihadists Rout Kurds*, N.Y. Times, Aug. 8, 2014, at A1. According to press accounts, releasing water from or destroying that dam could unleash walls of water that could travel hundreds of miles down the Euphrates River, cripple the electricity supply in Iraq, and potentially flood the southern regions of Baghdad. *See* Nigel Wilson, *Middle East Water Wars: Why Islamic State Wants Iraq's Dams*, Int'l Bus. Times, Aug. 5, 2014, https://www.ibtimes.co.uk/middle-east-water-wars-why-islamic-state-wants-iraqs-dams-1459895; Doug Struck, *The Coolest Posting in a Hot War Zone*, Wash. Post, Aug. 8, 2004, at A17.

In response to these developments (and subsequent developments described below), the United States began a series of targeted airstrikes against ISIL positions in Iraq, each directed at either protecting Americans from an impending threat or preventing a humanitarian catastrophe, and each also undertaken in part to assist Iraq, at its request, in combating ISIL.

***Airstrikes Near Erbil and Mount Sinjar.*** On August 7, 2014, President Obama announced that he had authorized two military operations in Iraq: "targeted airstrikes to protect our American personnel, and a humanitarian effort to help save thousands of Iraqi citizens who are trapped on a mountain without food and water and facing almost certain death." Office of the Press Secretary, The White House, Statement by the President (Aug. 7, 2014) ("President Obama August 7 Statement"), https://obamawhitehouse.archives.gov/the-press-office/2014/08/07/statement-president. In the first operation, U.S. military forces "conducted targeted airstrikes against terrorist forces outside the city of Erbil to prevent them from advancing on the city and to protect our American diplomats and military personnel." Office of the Press Secretary, The White House, Statement by the President on Iraq (Aug. 9, 2014) ("President Obama August 9 Statement"), https://obamawhitehouse.archives.gov/the-press-office/2014/08/07/statement-president. In the second operation, U.S. forces conducted airdrops of food and water on Mount Sinjar and targeted airstrikes against ISIL militants besieging the mountain in order to protect the stranded Yezidis and assist in their escape. *See* Office of the Press Secretary, The White House, Statement by the President (Aug. 14, 2014) ("President Obama August 14 Statement"), https://obamawhitehouse.

archives.gov/the-press-office/2014/08/14/statement-president; President Obama August 9 Statement. The President explained:

> When we face a situation like we do on that mountain—with inno- cent people facing the prospect of violence on a horrific scale— when we have a mandate to help—in this case, a request from the Iraqi government—and when we have the unique capabilities to help avert a massacre, then I believe the United States of America cannot turn a blind eye. We can act, carefully and responsibly, to prevent a potential act of genocide.

President Obama August 7 Statement. The President declined to specify a particular timetable for the airstrikes. *See* President Obama August 9 Statement. But he also emphasized that the United States was "not going to have . . . combat troops in Iraq again." *Id.*[4]

Consistent with the War Powers Resolution, 50 U.S.C. § 1543(a), President Obama provided a report to Congress less than forty-eight hours after the operations began:

> As I announced publicly on August 7, 2014, I have authorized the U.S. Armed Forces to conduct targeted airstrikes in Iraq. These mili- tary operations will be limited in their scope and duration as neces- sary to protect American personnel in Iraq by stopping the current advance on Erbil by the terrorist group Islamic State of Iraq and the Levant and to help forces in Iraq as they fight to break the siege of Mount Sinjar and protect the civilians trapped there.
>
> Pursuant to this authorization, on August 8, 2014, U.S. military forces commenced targeted airstrike operations in Iraq.

---

[4] On August 13, a senior White House official stated that the United States would con- sider using U.S. ground troops to assist the Iraqi government in evacuating refugees from Mount Sinjar but reiterated the President's commitment not to "reintroduc[e] U.S. forces into combat on the ground in Iraq." Colin Campbell, *White House: We May Use Combat Troops for Iraq Operation*, Bus. Insider, Aug. 13, 2014, https://www.businessinsider.com/ white-house-we-may-use-combat-troops-in-iraq-2014-8; *see also id.* (senior official explaining that any deployment of ground troops to assist in evacuating refuges would be "different than reintroducing U.S. forces in a combat role to take the fight to ISIL"). Ultimately, the President determined that ground troops were not necessary because the humanitarian airdrops and airstrikes had been successful. *See* President Obama August 14 Statement.

In addition, I have authorized U.S. Armed Forces to provide humanitarian assistance in Iraq in an operation that commenced on August 7, 2014. These operations will also be limited to supporting the civilians trapped on Mount Sinjar.

Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Regarding Iraq (Aug. 8, 2014) ("August 8 Report to Congress"), https://obamawhitehouse.archives.gov/the-press-office/2014/08/08/letter-president-war-powers-resolution-regarding-iraq. The report also explained that, in the President's judgment, the actions were "in the national security and foreign policy interests of the United States." *Id.* As authority for the military operations, President Obama invoked his "constitutional authority to conduct U.S. foreign relations" and his authority "as Commander in Chief and Chief Executive." *Id.*

The President and other administration officials emphasized on multiple occasions that both operations were undertaken at the specific request of the Iraqi government. *See, e.g.*, President Obama August 7 Statement; News Transcript, U.S. Dep't of Def., Remarks by Secretary Hagel at a Troop Event, San Diego, California (Aug. 12, 2014), http://archive.defense.gov/Transcripts/Transcript.aspx?TranscriptID=5485. The President's report to Congress likewise indicated that these actions were "being undertaken in coordination with the Iraqi government." August 8 Report to Congress.

*Airstrikes Near Mosul Dam.* On August 14, the President authorized further targeted airstrikes against ISIL positions around the Mosul Dam to assist the Iraqi forces in recapturing and establishing control of the dam. *See* Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Regarding Iraq (Aug. 17, 2014) ("August 17 Report to Congress"), https://obamawhitehouse.archives.gov/the-press-office/2014/08/17/letter-president-war-powers-resolution-regarding-iraq. In a report to Congress describing his authorization of this third set of airstrikes, the President cited the dangers posed by ISIL's control of the dam:

> On August 14, 2014, I authorized the U.S. Armed Forces to conduct targeted air strikes to support operations by Iraqi forces to recapture the Mosul Dam. These military operations will be limited in their scope and duration as necessary to support the Iraqi forces in their

efforts to retake and establish control of this critical infrastructure site, as part of their ongoing campaign against the terrorist group the Islamic State of Iraq and the Levant (ISIL). The failure of the Mosul Dam could threaten the lives of large numbers of civilians, endanger U.S. personnel and facilities, including the U.S. Embassy in Baghdad, and prevent the Iraqi government from providing critical services to the Iraqi populace.

*Id.* Administration officials noted that the airstrikes against ISIL positions in and around the Mosul Dam, like the prior sets of strikes, were undertaken "at the request of the Iraqi government." U.S. Dep't of Def., News Release, No. NR-432-14, Statement from Pentagon Press Secretary Rear Admiral John Kirby (Aug. 18, 2014), http://archive.defense.gov/Releases/Release.aspx?ReleaseID=16891. The strikes began on August 15 and ultimately assisted Iraqi forces in regaining control of the dam. *See id.*

   *Airstrikes Near Amirli.* By late August, it had become clear that a humanitarian crisis was developing in Amirli, a town in northern Iraq populated by Shiite Turkmen that had been besieged by ISIL militants for many weeks. *See, e.g.*, Ben Hubbard, *Dozens Killed at Sunni Mosque in Iraq After Attack on Shiite Leader*, N.Y. Times Int'l, Aug. 22, 2014, at A6. The siege had left the community without sufficient food, water, or medical supplies, and Iraqi leaders and human rights officials were appealing to the international community for assistance. *See id.* Further, because ISIL viewed the Shiite residents of the town as "infidels," the members of the community faced possible mass executions if ISIL gained control of the town. *See id.*; *see also* State Department June 15 Press Statement (noting ISIL's claim that it had massacred 1700 Iraqi Shiite air force recruits). In light of these developments, the State Department indicated that the United States was "very concerned about the dire conditions for the mainly Turkmen population in Amirli." Office of Press Relations, U.S. Dep't of State, Daily Press Briefing (Aug. 28, 2014) ("State Department August 28 Daily Press Briefing"), https://2009-2017.state.gov/r/pa/prs/dpb/2014/08/231125.htm. This concern was also reflected in earlier calls by U.N. officials for "immediate action to prevent the possible massacre of [Amirli's] citizens" and to address the "desperate" situation and "inhuman conditions" there. UN News, *Iraq: UN Envoy Calls for Immediate Action to Avert Possible "Massacre" in*

*Northern Town* (Aug. 23, 2014), https://news.un.org/en/story/2014/08/475762-iraq-un-envoy-calls-immediate-action-avert-possible-massacre-northern-town; *see also* Office of the High Commissioner, U.N. Human Rights, *Iraqi Civilians Suffering "Horrific" Widespread and Systematic Persecution—Pillay* (Aug. 25, 2014) (noting the "possible imminent massacre" of the 13,000 members of the Amirli Turkmen community and calling upon the "Government of Iraq and the Kurdistan region of Iraq, and the international community" to "take all necessary measures . . . to protect members of ethnic and religious communities"), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=14961&LangID=E.

On August 28, in response to this unfolding humanitarian crisis, President Obama authorized airdrops of supplies to Amirli as well as "targeted airstrikes in support of [the humanitarian] operation." Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Regarding Iraq (Sept. 1, 2014) ("September 1 Report to Congress"), https://obamawhitehouse.archives.gov/the-press-office/2014/09/01/letter-president-war-powers-resolution-regarding-iraq. U.S. aircraft dropped 109 bundles of humanitarian aid by August 31, and additional aid was delivered by coordinated British, French, and Australian airdrops. *See* News Release, U.S. Central Command, Release No. 20140835, *U.S. Military Conducts Airstrikes Against ISIL, Airdrops Humanitarian Aid Near Amirli* (Aug. 30, 2014) ("CENTCOM August 30 Release"), http://www.centcom.mil/MEDIA/NEWS-ARTICLES/News-Article-View/Article/884834/us-military-conducts-airstrikes-against-isil-airdrops-humanitarian-aid-near-ami. U.S. aircraft also conducted strikes on ISIL positions in support of the humanitarian operation. *Id.*

Within forty-eight hours after the Amirli operation began, President Obama reported the operation to Congress:

> On August 28, 2014, I . . . authorized U.S. Armed Forces to conduct targeted airstrikes in support of an operation to deliver humanitarian assistance to civilians in the town of Amirli, Iraq, which is surrounded and besieged by ISIL. Pursuant to this authorization, on August 30, 2014, U.S. military forces commenced targeted airstrike operations in the vicinity of Amirli, Iraq. These additional operations will be limited in their scope and duration as necessary to address this

emerging humanitarian crisis and protect the civilians trapped in Amirli.

September 1 Report to Congress. The President indicated that the Amirli operation, like the previous operations, had been "undertaken in coordination with and at request of the Iraqi government." *Id.*; *see also* CENTCOM August 30 Release (noting the actions were taken "[a]t the request of the Government of Iraq").

*Airstrikes Near Haditha Dam*. Throughout August, ISF and allied tribal fighters maintained control of the Haditha Dam against advances by ISIL militants. *See Jihadists Rout Kurds*, N.Y. Times, Aug. 8, 2014, at A1; Helene Cooper et al., *U.S. Intervention in Iraq Extends to a Second Dam*, N.Y. Times, Sept. 8, 2014, at A8. On September 6, 2014, to support these efforts, President Obama authorized the U.S. military to launch airstrikes against ISIL positions around the dam. *See* Office of the Press Secretary, The White House, Letter from the President—War Powers Resolution Regarding Iraq (Sept. 8, 2014) ("September 8 Report to Congress"), https://obamawhitehouse.archives.gov/the-press-office/2014/09/08/letter-president-war-powers-resolution-regarding-iraq. These airstrikes were conducted "in support of Iraqi Security Forces' efforts to retain control" of the dam, because the "destruction of the dam or release of water would create a level of flooding that would potentially pose a catastrophic threat to thousands of Iraqis along the Euphrates valley from Anbar province into parts of Baghdad, including possible flooding in areas in and around the Baghdad International Airport, where hundreds of U.S. personnel reside." Office of the Press Secretary, The White House, Statement by NSC Spokesperson Caitlin Hayden on Airstrikes Around the Haditha Dam (Sept. 7, 2014) ("NSC September 7 Statement"), https://obamawhitehouse.archives.gov/the-press-office/2014/09/07/statement-nsc-spokesperson-caitlin-hayden-airstrikes-around-haditha-dam; *see also* News Release, U.S. Dep't of Defense, Release No. NR-468-14, Statement from Pentagon Press Secretary Rear Admiral John Kirby on Haditha Dam Airstrikes (Sept. 7, 2014), http://archive.defense.gov/Releases/Release.aspx?ReleaseID=16927 (noting that flooding that might have resulted from a catastrophic failure of the dam "would have threatened U.S. personnel and facilities in and around Baghdad, as well as thousands of Iraqi

citizens"). President Obama reported this operation to Congress within forty-eight hours:

> On September 6, 2014, pursuant to my authorization, U.S. Armed Forces commenced targeted airstrikes in the vicinity of the Haditha Dam in support of Iraqi forces in their efforts to retain control of and defend this critical infrastructure site from ISIL. These additional military operations will be limited in their scope and duration as necessary to address this threat and prevent endangerment of U.S. personnel and facilities and large numbers of Iraqi civilians.

September 8 Report to Congress. President Obama again emphasized that, as in prior operations, he had authorized the use of force "in coordination with and at the request of the Iraqi government." *Id.*; *see also* U.S. Dep't of Def., News Transcript, Joint Press Availability by Secretary Hagel and Minister Alasania in Georgia (Sept. 7, 2014), http://archive. defense.gov/Transcripts/Transcript.aspx?TranscriptID=5499 (noting that the "Iraqi security forces on the ground . . . conceived of the operation" and the "Iraqi government asked [the United States] for [its] support in th[e] strikes").[5]

## II.

In our recent opinion concerning the President's authority to conduct military operations in Libya, we explained in detail our framework for analyzing the President's legal authority to use military force abroad without prior congressional authorization. *See Authority to Use Military Force in Libya*, 35 Op. O.L.C. 20, 27–33 (2011) ("*Military Force in Libya*"). In light of that discussion, we need not provide a detailed explanation of our framework here. Instead, we will summarize briefly the

---

[5] Although the President had begun developing his new comprehensive strategy to counter ISIL at the time that he authorized airstrikes around the Haditha Dam, *see supra* note 1, it is our understanding that those airstrikes were not intended to implement the new strategy, which had not yet been finalized or announced when the strikes were initiated. Rather, as the President's Report to Congress explains, the Haditha airstrikes were an independent operation "limited in their scope and duration" as necessary to protect the dam, U.S. personnel and facilities, and Iraqi civilians. September 8 Report to Congress.

relevant legal principles before applying them to the airstrike operations described above.

As our Libya opinion explains, Attorneys General and this Office have consistently concluded that "'the President has the power to commit United States troops abroad,' as well as to 'take military action,' 'for the purpose of protecting important national interests,' even without specific prior authorization from Congress." *Id.* at 27–28 (quoting *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 9 (1992) ("*Military Forces in Somalia*")). This power is rooted in the President's constitutional authority as Chief Executive and Commander in Chief of the armed forces. U.S. Const. art. II, § 1, cl. 1; *id.* § 2, cl. 1. The assignment of the "executive Power" to the President has, over time, been understood to give him the "'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)), as well as "independent authority 'in the areas of foreign policy and national security,'" *id.* at 429 (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)). And the President's authority as Commander in Chief gives him the authority to superintend and direct the movements of the military forces placed at his command. *See Loving v. United States*, 517 U.S. 748, 772 (1996); *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850). The President also holds an "implicit advantage . . . over the legislature under our constitutional scheme in situations calling for immediate action," because of his ability to act and respond to developing situations with greater facility and speed. *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 187 (1980) ("*Presidential Power*"); *see also Presidential Authority to Permit Incursion Into Communist Sanctuaries in the Cambodia-Vietnam Border Area*, 1 Op. O.L.C. Supp. 313, 314 (1970) (noting that the Framers "recognized the need for quick executive response to rapidly developing international situations").

Presidents have exercised these authorities numerous times throughout the Nation's history to deploy the armed forces abroad without either a declaration of war or other congressional authorization, beginning in the earliest days of the Republic. *See Military Forces in Somalia*, 16 Op. O.L.C. at 9 (citing an example from 1801); *Presidential Power*, 4A Op. O.L.C. at 187 ("Our history is replete with instances of presidential uses

of military force abroad in the absence of prior congressional approval."). *See generally* Barbara Salazar Torreon, Cong. Research Serv., R42738, *Instances of Use of United States Armed Forces Abroad, 1798–2013*, at 2–33 (Aug. 30, 2013) ("*Instances of Force Abroad*") (citing numerous examples). In the foreign affairs and national security context, where judicial review is rare, *see Agee*, 453 U.S. at 292, such a "pattern of executive conduct, made under claim of right, extended over many decades[,] and engaged in by Presidents of both parties, evidences the existence of broad constitutional power." *Military Force in Libya*, 35 Op. O.L.C. at 29–30 (internal quotation marks omitted); *see also Proposed Deployment of United States Armed Forces into Bosnia*, 19 Op. O.L.C. 327, 330–31 (1995) ("*Proposed Bosnia Deployment*") (noting that the "scope and limits" of the President's and Congress's respective powers have been "clarified by 200 years of practice").

To be sure, the Constitution also gives Congress the power to "declare War," to provide for the common defense, and to raise, support, maintain, and make rules for the armed forces. U.S. Const. art. I, § 8, cls. 1, 11–14. These congressional powers may limit the President's authority to initiate without prior congressional authorization a "prolonged and substantial" "planned military engagement that constitutes a 'war' within the meaning of the Declaration of War Clause." *Military Force in Libya*, 35 Op. O.L.C. at 31. They may also permit Congress in certain respects to restrict how the President exercises his military authorities. *See id.* at 28. But "the historical practice of presidential military action without congressional approval precludes any suggestion that Congress's authority to declare war covers every military engagement, however limited, that the President initiates." *Id.* at 31. Indeed, "Congress itself has implicitly recognized" the President's unilateral authority to initiate military engagements in the War Powers Resolution, which, by imposing reporting and other requirements on the President's introduction of armed forces into hostilities or imminent hostilities absent a congressional declaration of war, "'recognizes and presupposes the existence of unilateral presidential authority to deploy armed forces'" into such situations. *Id.* at 30 (quoting *Deployment of United States Armed Forces into Haiti*, 18 Op. O.L.C. 173, 175 (1994) ("*1994 Haiti Deployment*")).

Synthesizing these precedents in our Libya opinion, we explained that, in any particular instance, the President's authority to order military

action abroad without prior congressional approval turns on two considerations: first, whether the contemplated action would serve "sufficiently important national interests" to "permit the President's action as Commander in Chief and Chief Executive"; and second, whether the contemplated action would be sufficiently limited in "nature, scope, and duration" so as not to constitute a "war" requiring prior congressional approval under the Declaration of War Clause. *Id.* at 33. We now turn to an analysis of the airstrike operations detailed above under this two-part framework.

## A.

We consider first whether the operations served "sufficiently important national interests" to fall within the President's constitutional authority as Commander in Chief and Chief Executive. *Military Force in Libya*, 35 Op. O.L.C. at 33. In authorizing the targeted airstrikes against ISIL, President Obama identified at least three relevant national interests: protecting American lives and property; assisting an ally or strategic partner at its request; and protecting endangered populations against humanitarian atrocities, including possible genocide. In our view, a combination of these interests supported the President's constitutional authority as Commander in Chief to order each of the airstrike operations described above without express congressional authorization.

## 1.

The first national interest identified by President Obama—the protection of American citizens and property—has long been recognized as a basis on which Presidents may authorize military action abroad without prior congressional approval. *See Presidential Power*, 4A Op. O.L.C. at 121 ("It is well established that the President has the constitutional power as Chief Executive and Commander-in-Chief to protect the lives and property of Americans abroad."); *Military Forces in Somalia*, 16 Op. O.L.C. at 9 ("At the core of" the President's power to use military force without prior congressional authorization "is the President's authority to take military action to protect American citizens, property, and interests from foreign threats."); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990) (noting that "[t]he United States frequently employs

Armed Forces outside this country . . . for the protection of American citizens"); *In re Neagle*, 135 U.S. 1, 63–64 (1890) (recognizing that the obligation to protect American citizens abroad is among the President's "rights, duties, and obligations growing out of the Constitution itself"); *Durand v. Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4186) (stating that "the interposition of the president abroad, for the protection of the citizen, must necessarily rest in his discretion"). Presidents have relied on this interest numerous times to support both defensive and offensive military action abroad. *See, e.g.*, J. Reuben Clark, U.S. Solicitor, Dep't of State, *Right to Protect Citizens in Foreign Countries by Landing Forces* 34–38 (3d rev. ed. 1933) ("*Right to Protect*") (collecting examples prior to 1910); *Authority of the President to Repel the Attack in Korea*, 23 Dep't of State Bull. 173, 177–78, *reprinted in* H.R. Rep. No. 81-2495, at 61, 67–68 (1950) (collecting examples between 1812 and 1932) ("Korea Memorandum"); *Instances of Force Abroad* at 2–33 (citing additional examples). President McKinley, for instance, dispatched 5,000 troops to China in significant part to protect American lives and property during the Boxer Rebellion. *See* William McKinley, Annual Message of the President to Congress (Dec. 3, 1900), *Papers Relating to the Foreign Relations of the United States, 1900*, at XI–XIV (1902) (describing the operation in detail); *see also Deployment of United States Armed Forces to Haiti*, 28 Op. O.L.C. 30, 32 (2004) ("*2004 Haiti Deployment*"). President Taft sent more than 2,000 troops to Nicaragua in 1912 in part to protect Americans during an ongoing revolution in that country. *Right to Protect* at 119–22; *see also* W.H. Taft, Annual Message of the President to Congress (Dec. 3, 1912), *Papers Relating to the Foreign Relations of the United States, 1912*, at XII–XIII (1919). And President Johnson ordered military intervention in the Dominican Republic in 1965 in large part to protect Americans living there. *See 2004 Haiti Deployment*, 28 Op. O.L.C. at 32. More recently, in 2004, President George W. Bush deployed troops to Haiti in part to protect the thousands of Americans living there who "would [have been] in danger if the country [had] descend[ed] into lawlessness." *Id.*

In our view, it was reasonable for the President to rely on a national interest in protecting American personnel and property in authorizing the airstrikes around Erbil, the Mosul Dam, and the Haditha Dam. As noted earlier, numerous American military advisers, diplomats, and other civilians are based in Erbil. Given ISIL's brutal treatment of the populations it

encounters and those who oppose its aims, *see supra* Part I, the lives of these Americans would have been placed in jeopardy if ISIL had taken control of Erbil. The airstrikes against ISIL forces outside the city were therefore justified in order to protect these American lives. Similarly, American lives and property in Baghdad would have been placed in jeopardy if ISIL had destroyed the Mosul Dam—whether through purposeful action or an inability to perform the "extraordinary engineering measures" necessary to maintain it, *Geologic Setting of Mosul Dam* at 2— or if ISIL had taken control of and destroyed or released floodwaters from the Haditha Dam, *see* NSC September 7 Statement. More than 5,000 contractors, including 2,000 U.S. citizens, were working at the U.S. Embassy in Baghdad as of June. *See* Dan Lamothe, *Diplomats, Pilots, and Hired Guns: Here Are the Americans Left in Iraq*, Wash. Post, June 12, 2014, https://www.washingtonpost.com/news/checkpoint/wp/2014/06/12/diplomats-pilots-and-hired-guns-here-are-the-americans-left-in-iraq. The destruction of the Mosul Dam could have resulted in flooding in Baghdad, *see* Mosul Dam Letter, which the President determined could have "endanger[ed] U.S. personnel and facilities, including the U.S. Embassy in Baghdad, and prevent[ed] the Iraqi government from providing critical services" to the populace. August 17 Report to Congress. The destruction of the Haditha Dam could similarly have caused flooding in the southern areas of Baghdad, including areas where U.S. personnel are located, which the President determined could have "endanger[ed] U.S. personnel and facilities." September 8 Report to Congress; *see also* NSC September 7 Statement. In light of these risks, it was also reasonable for the President to rely on the national interest in protecting U.S. personnel and property in authorizing military action to help Iraqi forces retake the Mosul Dam and retain control of the Haditha Dam.

### 2.

In authorizing the airstrike operations at issue in this opinion, President Obama also invoked a national interest in assisting Iraq, a strategic partner, in its campaign against ISIL. *See* August 8 Report to Congress (indicating the airstrikes near Erbil and Mount Sinjar would "help forces in Iraq" and were "undertaken in coordination with the Iraqi government"); August 17 Report to Congress (indicating the airstrikes around the Mosul

Dam were undertaken "to support the Iraqi forces in their efforts" to recapture the dam and in "their ongoing campaign against [ISIL]"); September 1 Report to Congress (noting the operation had been undertaken "in coordination with and at the request of the Iraqi government"); September 8 Report to Congress (indicating the airstrikes around Haditha Dam were undertaken "in support of Iraqi forces in their efforts to retain control of and defend this critical infrastructure site from ISIL"). We believe that it was reasonable for the President to rely on this interest, in combination with a national interest in protecting American citizens and property or averting a humanitarian catastrophe, in ordering the use of military force abroad.

Our Office has previously recognized that, in authorizing military action abroad, the President may rely on a national interest in assisting an ally or strategic partner at its request. In our 1980 opinion on possible uses of force related to the Iranian hostage crisis, for example, we identified "defending our allies" as a purpose for which the President may constitutionally use force without prior congressional approval, and pointed to the deployment of troops to Korea as "precedent . . . for the commitment of United States armed forces, without prior congressional approval or declaration of war, to aid an ally in repelling an armed invasion." *Presidential Power*, 4A Op. O.L.C. at 186 n.2, 187–88.[6] Similarly, in our 1994 opinion concluding that the President had constitutional authority to send 20,000 troops to Haiti to forcibly remove its military dictators from power, we relied in significant part on the fact that the planned deployment was to take place at the invitation of Haiti's legitimate government, citing in support several prior examples of Presidents deploying the military abroad at the request of foreign countries.

---

[6] The fact that this national interest supported the Korea operation does not mean that the Korea deployment was sufficiently limited in nature, scope, and duration to be within the President's constitutional authority to act without congressional authorization. *See 1994 Haiti Deployment*, 18 Op. O.L.C. at 178–79. We take no position on the latter question in this opinion. *See The President and the War Power: South Vietnam and the Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. 321, 329 (1970) (noting that President Truman's action in Korea had ignited a "Great Debate" in Congress over the President's war power); *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 331–32 n.5 (noting that "[t]he boldest claim of Executive authority to wage war without congressional authorization was made at the time of the Korean War," and that "[s]uch sweeping claims of inherent Executive authority have been sharply criticized").

*1994 Haiti Deployment*, 18 Op. O.L.C. at 174 n.1, 178–79 & n.10[7]; *see also* Leonard C. Meeker, Legal Adviser, Dep't of State, *The Legality of*

---

[7] The discussion of U.S. military action taken at the request of foreign governments in our 1994 Haiti opinion appeared in the context of a discussion of the Declaration of War Clause, rather than a discussion of national interests supporting an exercise of the Commander in Chief power. But that is because the entire constitutional discussion in that opinion was framed as a discussion of the Declaration of War Clause. This feature of the opinion is not unusual: the two-part inquiry we developed in our Libya opinion is a recent refinement in this Office's jurisprudence, and our earlier opinions frequently analyzed the question of the President's constitutional authority to deploy the military abroad without prior congressional authorization under the rubric of a single inquiry, asking either whether a contemplated military action fell within the President's constitutional power as Commander in Chief and Chief Executive to act in the national interest, *see, e.g.*, *2004 Haiti Deployment*, 28 Op. O.L.C. at 31–33; *Military Forces in Somalia*, 16 Op. O.L.C. at 9–12; *Presidential Power*, 4A Op. O.L.C. at 186–88, or whether a proposed use of force would constitute a "war" within the meaning of the Constitution, *see, e.g.*, *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 330–34; *1994 Haiti Deployment*, 18 Op. O.L.C. at 177–79. The analysis in these earlier opinions, however, frequently incorporated in substance both components of the two-part framework set forth above.

Thus, even though we considered assistance to an ally or partner in our 1994 Haiti opinion in the context of a discussion of the Declaration of War Clause, our opinion appeared to invoke that interest at least in part as a justification for the use of force abroad, not simply as an explanation for why the conflict was likely to be limited in nature, scope, and duration. In introducing historical examples of such assistance, for example, we observed that "the President, as Chief Executive and Commander in Chief . . . may, absent specific legislative restriction, deploy United States armed forces abroad or to any particular region," and then noted that "Presidents have often utilized this authority, in the absence of specific legislative authorization, to deploy United States military personnel into foreign countries at the invitation of the legitimate governments of those countries." *1994 Haiti Deployment*, 18 Op. O.L.C. at 178 (internal quotation marks omitted). This formulation suggests that we recognized that prior Presidents had considered a foreign government's request for assistance to be an overall justification for the deployment of troops abroad under their Chief Executive and Commander in Chief authority, not simply an indicator of a conflict's likely scope. The examples of prior presidential action we cited in our opinion are consistent with this characterization. *See infra* pp. 103–109 (discussing examples of Nicaragua, Greenland, Iceland, and the Philippines also cited in 1994 Haiti opinion). Further—and significantly—our 1994 Haiti opinion also recognized that the mere fact that the United States "deploys its troops into a country at the invitation of that country's legitimate government" does not mean that the engagement is not a "war," and conducted a separate analysis of the proposed Haitian deployment's "nature, scope, and duration" to establish that it did not "rise to the level of 'war.'" *1994 Haiti Deployment*, 18 Op. O.L.C. at 178–79. These features of our 1994 opinion suggest that its discussion of assistance to an ally or partner fits most naturally into the "national interest" element of our current two-part test.

*United States Participation in the Defense of Viet-Nam*, 54 Dep't of State Bull. 474, 489 (1966) ("*Participation in Viet-Nam*") (concluding that the President had constitutional "authority to commit United States forces in the collective defense of South Viet-Nam" on the request of that country and that "[t]his authority stems from the constitutional powers of the President").

Historical practice is consistent with this position. Presidents have taken military action abroad or deployed U.S. military personnel into foreign countries without prior congressional approval on numerous occasions for the purpose of assisting an ally or partner at its request. In February 1874, for example, rioting began in still-independent Hawaii after the election of a new king. *Right to Protect* at 67. "[A]t the earnest solicitation of [Hawaii's] government," U.S. troops landed amid active rioting in Honolulu "to aid in restoring order." *Id.* (quoting *Report of the Secretary of the Navy*, H.R. Exec. Doc. No. 43-1, pt. 3, at 8 (1874)); *see also Instances of Force Abroad* at 6. In 1912, an attempted coup resulted in "open rebellion" against the government in Nicaragua. *Papers Relating to the Foreign Relations of the United States, 1912*, at 1032. In response, the Government of Nicaragua requested that the United States "guarantee with its forces security for the property of American citizens" and provide "protection to all inhabitants of the Republic." *Id.*; *see also Right to Protect* at 119–20. Conveying this request to President Taft, the Secretary of State asked for the deployment of troops to Nicaragua "in view of the specific request of the Nicaraguan Government and of the seemingly possible danger of resultant anarchy." *Papers Relating to the Foreign Relations of the United States, 1912*, at 1032–33. President Taft granted the request. *See id.* at 1033. And in 1919, at the request of Italian

---

We do not mean to imply that if the government of a particular territory requests that the United States use armed force in that territory, such a request cannot also be relevant in some circumstances to whether an action constitutes a "war." In our opinion regarding a proposed deployment to Bosnia, for instance, we explained that the "consensual nature" of the operation—the fact that the parties who controlled the territory at issue had requested intervention—tended to suggest that "little or no resistance to the deployment w[ould] occur," and served to distinguish the deployment of force from traditional wars aimed at conquest or occupation of territory, both considerations that inform an analysis of the anticipated "nature, scope, and duration" of a conflict. *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332.

authorities and without the prior knowledge or consent of Congress, U.S. troops landed at Trau, Dalmatia—territory that was the subject of a post-World War I dispute between Italian and Serbian forces—in order to prevent an imminent conflict. *See Instances of Force Abroad* at 9; Clarence Arthur Berdahl, *War Powers of the Executive in the United States* 56 (1921). In response to a Senate resolution seeking information about the incident, the Secretary of the Navy emphasized the "fact that Italian authorit[ies] [had] requested [the] action" and that, had the United States not acted, "a state of actual war" might have resulted. *Landing Marines at Trau, Dalmatia*, S. Doc. No. 66-117, at 2 (1919).[8]

Similarly, before the United States joined the Second World War—but after the war had begun in Europe and it was feared that Germany might attack the Western Hemisphere—President Franklin D. Roosevelt unilaterally authorized military action "designed to aid the allied forces" at the request of foreign officials. *The President and the War Power: South Vietnam and the Cambodian Sanctuaries*, 1 Op. O.L.C. Supp. 321, 330 (1970). Pursuant to an agreement made with a Danish minister, President Roosevelt ordered the U.S. military to occupy Greenland after Denmark fell to Germany in 1940. *Id.*; *see also 1994 Haiti Deployment*, 18 Op. O.L.C. at 178. And in 1941, he authorized U.S. troops to occupy Iceland "in defense of that country," pursuant to an agreement he concluded with Iceland's Prime Minister. Korea Memorandum, 23 Dep't of State Bull. at 175, *reprinted in* H.R. Rep. No. 81-2495, at 65; *see also 1994 Haiti Deployment*, 18 Op. O.L.C. at 178. Although these actions plainly furthered the national security interest in preventing Germany from gaining a foothold in the Western Hemisphere and attacking transatlantic shipping lanes, President Roosevelt indicated that the actions were also undertaken to assist friendly nations in defending their territory against Germany's aggression. *See* Samuel I. Rosenman, *The Public Papers and Addresses of*

---

[8] In congressional debates about the Trau incident, one Senator argued that the deployment of U.S. forces had been authorized by the "practically unlimited resources and unlimited power" Congress had given the President to fight World War I. 58 Cong. Rec. 6124–25 (1919). But as other Senators pointed out, at the time the troops were sent to Dalmatia, the United States had already signed an armistice, and in any event had never been at war with Italy or Serbia. *See id.* at 6123–29; *see also Landing at Trau Hotly Condemned in Senate Debate*, N.Y. Times, Sept. 30, 1919 (describing the competing views).

*Franklin D. Roosevelt 1941*, at 262 ("[T]he Government of the United States, while undertaking this defensive measure for the preservation of the independence and security of the democracies of the New World, [will] at the same time be afforded the privilege of cooperating in this manner with your Government in the defense of this historic democracy of Iceland." (quoting message sent by President Roosevelt to the Prime Minister of Iceland)); *id.* at 96–97 (quoting President Roosevelt's announcement that the establishment of U.S. bases in Greenland was "new proof of our continuing friendliness to Denmark").

Several years later, in July of 1958, President Eisenhower sent a "contingent of United States Marines" to Lebanon in response to an "urgent request" from its president for assistance in the face of a "violent insurrection" whose "avowed purpose" was to "overthrow the legally constituted government of Lebanon." *Special Message to the Congress on the Sending of United States Forces to Lebanon* (July 15, 1958), Pub. Papers of Pres. Dwight D. Eisenhower 550, 550–51 (1958). President Eisenhower explained to Congress that "United States forces are being sent to Lebanon to protect American lives and by their presence to assist the Government of Lebanon in the preservation of Lebanon's territorial integrity and independence." *Id.*; *see also Statement by the President on the Lebanese Government's Appeal for U.S. Forces* (July 15, 1958), Pub. Papers of Pres. Dwight D. Eisenhower 549, 549–50 (1958). "As we act at the request of a friendly government to help it preserve its independence and to preserve law and order which will protect American lives," the President added, "we are acting to reaffirm and strengthen principles upon which the safety and security of the United States depend." *Special Message to Congress on Lebanon*, Pub. Papers of Pres. Dwight D. Eisenhower at 552 (1958). Vice President Nixon made clear that the "President had the constitutional power to do what he did" in part because of the U.S. interest in "strengthen[ing] th[e] [Lebanese] government in its efforts to resist forces in its country which were stimulated and materially assisted by forces outside the country." 104 Cong. Rec. 14,548 (1958). The Vice President explained that the "failure to come to the aid of a government that had been friendly to the United States" and had requested America's help "would have struck fear and consternation and probably panic into the hearts of the friends

of the United States not only in that area, but all the way from Morocco on the Atlantic clear over to the Pacific area." *Id.* at 14,550.[9]

In 1982, President Reagan again sent U.S. troops to Lebanon "[i]n response to the formal request of the Government of Lebanon," this time to help ensure the departure of Palestine Liberation Organization leadership, offices, and combatants from Beirut and the restoration of Lebanese government authority in the area. *Letter to the Speaker of the House and the President Pro Tempore of the Senate on the Deployment of United States Forces in Beirut, Lebanon* (Aug. 24, 1982), 2 Pub. Papers of Pres. Ronald Reagan 1078, 1078 (1982). *See generally The Situation in the Middle East: Hearing Before the S. Comm. on Foreign Relations*, 97th Cong. 1–14 (1982). In a notification to Congress "consistent with the War Powers Resolution," President Reagan stated that U.S. forces had been deployed, "pursuant to the President's constitutional authority with respect to the conduct of foreign relations and as Commander-in-Chief of the United States Armed Forces," to "assist the Government of Lebanon in carrying out its responsibilities concerning the withdrawal [from Beirut] of . . . personnel [associated with the Palestine Liberation Organization] under safe and orderly conditions," as agreed to by the Government of Lebanon, the Government of Israel, and the Palestine Liberation Or-

---

[9] In 1957, Congress had passed a Joint Resolution to Promote Peace and Stability in the Middle East, which gave the President the authority to "use armed forces to assist" nations or groups of nations in the Middle East if they "request[ed] assistance against armed aggression from any country controlled by international communism." Pub. L. No. 85-7, § 2, 71 Stat. 5, 5 (1957). After President Eisenhower deployed troops to Lebanon, there was some discussion in Congress about whether the deployment fit within the terms of this resolution, with several Senators expressing the position that it did not. *See* Arthur Krock, *Law and Intervention: An Analysis of Eisenhower Doctrine's Application to U.S. Landing in Lebanon*, N.Y. Times, July 16, 1958, at 8; *see also* Jane E. Stromseth, *Understanding Constitutional War Powers Today: Why Methodology Matters*, 106 Yale L.J. 845, 870 n.132 (1996) (noting the debate on the question). In any event, Vice President Nixon subsequently made clear that the President had acted solely in reliance on his constitutional authority, *see* 104 Cong. Rec. 14,548 (1958), and later Executive Branch opinions have described President Eisenhower's deployment of troops to Lebanon as having been undertaken without statutory authorization, *see, e.g.*, *Participation in Viet-Nam*, 54 Dep't of State Bull. at 484–85; Memorandum for President Lyndon Johnson from Secretary of State Dean Rusk, *Re: Legal Basis for Sending American Forces to Viet-Nam* (June 29, 1964), *reprinted in* Stephen M. Griffin, *A Bibliography of Executive Branch War Powers Opinions Since 1950*, 87 Tul. L. Rev. 649, 658–61 (2013).

ganization. *Letter on the Deployment of United States Forces in Beirut, Lebanon*, 2 Pub. Papers of Pres. Ronald Reagan at 1078–79 (1982). And in his remarks to the Nation on the deployment, the President emphasized the "irreversible commitment" of the United States "to the survival and territorial integrity of friendly states." *Address to the Nation on United States Policy for Peace in the Middle East* (Sept. 1, 1982), 2 Pub. Papers of Pres. Ronald Reagan 1093, 1093 (1982).[10]

The next year, when Grenada experienced widespread anarchy and violence after a "Revolutionary Military Council" assassinated the Prime Minister and several other government officials and seized political power, President Reagan authorized the deployment of nearly 2,000 U.S. troops to invade the island, supported by the U.S. Air Force and Navy. *See Conyers v. Reagan*, 765 F.2d 1124, 1125–26 (D.C. Cir. 1985); Richard F. Grimmet, Cong. Research Serv., R42699, *The War Powers Resolution: After Thirty-Eight Years* 15 (Sept. 24, 2012) ("*War Powers Resolution*"). The President noted in oral remarks that he had "received an urgent, formal request" from the Organization of Eastern Caribbean States ("OECS"), of which Grenada was a member, "to assist in a joint effort to restore order and democracy on the island of Grenada." *Remarks of the President and Prime Minister Eugenia Charles of Dominica Announcing the Deployment of United States Forces in Grenada* (Oct. 25, 1983), 2 Pub. Papers of Pres. Ronald Reagan 1505, 1505 (1983).[11] Presi-

---

[10] The U.S. troops formed part of a multinational force that was sent to the country on multiple occasions beginning in August 1982 to "facilitate the restoration of Lebanese Government sovereignty and authority" and "thereby further the efforts of the Government of Lebanon to assure the safety of persons in the area and bring to an end the violence" in the region. *Letter to the Speaker of the House and President Pro Tempore of the Senate Reporting on United States Participation in the Multinational Force in Lebanon* (Sept. 29, 1982), 2 Pub. Papers of Pres. Ronald Reagan 1238, 1238 (1982). Although President Reagan indicated repeatedly that the troops would not engage in hostilities except in self-defense, the ongoing hostilities in the country resulted in the deaths of numerous U.S. troops, and President Reagan ultimately received legislative authorization for continuing the operations beyond October 1983. *See* Richard F. Grimmet, Cong. Research Serv., R42699, *The War Powers Resolution: After Thirty-Eight Years* 13–15 (Sept. 24, 2012); Multinational Force in Lebanon Resolution, Pub. L. No. 98-119, 97 Stat. 805 (1983).

[11] In addition, the Governor-General of Grenada—described by the former U.S. ambassador to the Eastern Caribbean as the "sole legitimate source of authority on the island"—

dent Reagan also made clear that, along with protecting American citizens trapped in Grenada, the mission was intended "to forestall further chaos" and "to assist in the restoration of conditions of law and order and of governmental institutions to the island of Grenada." *Id.* at 1506. The President's letter to Congress, transmitted "consistent with the War Powers Resolution," similarly indicated that, pursuant to his "constitutional authority with respect to the conduct of foreign relations and as Commander-in-Chief," he had authorized military action because the OECS, "concerned by the deteriorating conditions in [its] member State of Grenada," had "requested the immediate cooperation of a number of friendly countries" in an effort to "restore order," as well as to "protect[] the lives of the United States citizens" there. *Letter to the Speaker of the House and the President Pro Tempore of the Senate on the Deployment of United States Forces in Grenada* (Oct. 25, 1983), 2 Pub. Papers of Pres. Ronald Reagan 1512, 1512–13 (1983).

Similarly, President George H.W. Bush authorized the use of military force in the Philippines in 1989 when military leaders seized an air force base, attacked government facilities, and bombed the presidential palace as part of a coup attempt. *Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate on United States Military Assistance to the Philippines* (Dec. 2, 1989), 2 Pub. Papers of Pres. George Bush 1622, 1622–23 (1989). After the President of the Philippines "formally requested limited U.S. military assistance to support her forces as they attempted to put down the coup," President Bush, acting "pursuant to [his] constitutional authority with respect to the conduct of foreign relations and as Commander in Chief," authorized U.S. military aircraft to "establish a protective cover . . . to prevent rebel aircraft from taking off." *Id.* at 1623. Although "[n]o rebel aircraft attempted to take

---

appealed to the United States for help, adding "weight to the legal and political basis for the invasion." *U.S. Military Actions in Grenada: Implications for U.S. Policy in the Eastern Caribbean: Hearings Before the Subcomm. on Int'l Sec. and Scientific Affairs & on W. Hemisphere Affairs of the H. Comm. on Foreign Affairs*, 98th Cong. 59 (1988) (statement of Sally A. Shelton); *see also Radio Address to the Nation on International Stability* (Oct. 26, 1985), 2 Pub. Papers of Pres. Ronald Reagan 1294, 1294 (1985) (noting on the second anniversary of the operation that "Grenada's Governor-General" had "appealed for [the United States's] help to restore order in his country, threatened by the machinery of dictatorship").

off, and U.S. aircraft did not fire," President Bush made clear in his War Powers Resolution notification to Congress that he would be "prepared . . . to take additional [military] actions" not only "to protect the lives of Americans" but also, "if requested, to provide further assistance to the government of the Philippines," in recognition of the fact that the United States had "worked . . . over the years to provide assistance to the democratically elected government of the Philippines." *Id.*

Along similar lines, after Iraq had invaded Kuwait and was threatening Saudi Arabia in 1990, and the "Saudi Government had requested [the] help" of the United States, President Bush deployed the military to "assist the Saudi Arabian Government in the defense of its homeland." *Address to the Nation Announcing the Deployment of United States Armed Forces to Saudi Arabia* (Aug. 8, 1990), 2 Pub. Papers of Pres. George Bush 1107, 1107–08 (1990). In his address to the Nation, President Bush explained that his decision "gr[e]w[] out of the longstanding friendship and security relationship between the United States and Saudi Arabia" and out of the principle that "America will stand by her friends." *Id.* at 1109. And in his War Powers Resolution report to Congress, the President indicated that the U.S. troops would remain "so long as their presence is . . . desired by the Saudi government to enhance [its] capability . . . to defend the Kingdom." *Letter to Congressional Leaders on the Deployment of United States Armed Forces to Saudi Arabia and the Middle East* (Aug. 9, 1990), 2 Pub. Papers of Pres. George Bush 1116, 1116 (1990). President Bush also stated that he had taken these actions "pursuant to [his] authority to conduct our foreign relations and as Commander in Chief." *Id.*

Finally, as referenced above, President Clinton, in coordination with the deposed, democratically elected President of Haiti, authorized military action in Haiti without congressional approval to force the military dictators from power and "restore Haiti's legitimate, democratically elected government." *Address to the Nation on Haiti* (Sept. 15, 1994), 2 Pub. Papers of Pres. William J. Clinton 1558, 1558–60 (1994); *see also War Powers Resolution* at 37–39. Although an eleventh-hour agreement with the dictators reduced the risk of direct hostilities, President Clinton had authorized a hostile military invasion involving 20,000 troops, to be deployed in conjunction with an international coalition. *See 1994 Haiti Deployment*, 18 Op. O.L.C. at 174 n.1, 179 n.10; *War Powers Resolution*

at 38; *Address to the Nation on Haiti* (Sept. 18, 1994), 2 Pub. Papers of Pres. William J. Clinton 1571, 1571–72 (1994).[12]

In light of this historical practice and our precedent, we believe the President had the constitutional authority to rely on a national interest in supporting Iraq, a strategic partner, in ordering targeted airstrikes against ISIL without congressional approval. Although the President's support to the Iraqi government was limited to five particular operations that also served other national interests, *see supra* Part II.A.1 and *infra* Part II.A.3, the Iraqi government requested the assistance of the United States with respect to all of those operations, and the President determined that agreeing to these requests would materially aid Iraq in its "ongoing campaign against [ISIL]." August 17 Report to Congress; *see* August 8 Report to Congress (noting the Erbil operation would help "stop[] the current advance on Erbil"); September 1 Report to Congress (noting the action had been taken "at the request of the Iraqi government"); September 8 Report to Congress (noting the Haditha Dam airstrikes were undertaken "in coordination with and at the request of the Iraqi Government" to support "Iraqi forces in their efforts to retain control of and defend [their] critical infrastructure"). ISIL, moreover, presents an acute threat to the Iraqi Government's control over its country, to law and order within the country, and to the safety of Iraq's citizens. *See supra* Part I. President Obama's actions in assisting the Iraqi government's campaign against ISIL thus mirror military action taken by past Presidents to suppress insurrection, maintain order, or restore a rightful government upon an ally's or strategic partner's request, or to answer a friendly government's request for help in defending itself from attack.

---

[12] Responding to an ally's or partner's request for assistance bears some resemblance to obtaining the consent of a foreign government for using armed force in its territory, which is a justification under international law for the use of force in such circumstances. But even leaving aside the differences between responding to an affirmative request from an ally or partner and seeking consent from a country for military action the United States seeks to initiate, nothing in the presidential statements discussed in the text suggests that these Presidents were invoking assistance to an ally or partner primarily as an international law justification for their actions. Indeed, as we noted in the text, Presidents have included assistance to allies or strategic partners as a reason for taking military action in reports sent to Congress "consistent with the War Powers Resolution," which requires an explanation of the domestic "constitutional and legislative authority" pursuant to which the President has authorized military action. 50 U.S.C. § 1543(a).

In addition, Iraq—like many of the allies or partners Presidents assisted in the examples described above—is a country of particular strategic importance to the United States and one that the United States has aided in the past and has made an ongoing commitment to assist. The use of military force to assist allies in general is consistent with the current U.S. national security strategy, which expressly states that "[t]he foundation of the United States, regional, and global security will remain America's relations with our allies, and our commitment to their security is unshakable." National Security Strategy 41 (May 2010), http://nssarchive.us/NSSR/2010.pdf. And with respect to Iraq in particular, the United States has a recent history of providing assistance, including military assistance authorized by Congress, as Iraq works to establish itself as a stable country in a volatile and strategically important region. *See* Iraq AUMF; *supra* Part I (discussing surge). Although the United States withdrew its troops from Iraq in 2011, it simultaneously committed to "continue to foster close cooperation concerning defense and security arrangements" and to "improve and strengthen the security and stability in Iraq." Strategic Framework Agreement at 2–3; *see also* U.S. Dep't of Def., News Transcript, Joint Press Conference by Secretary Hagel and Minister Johnston in Sydney, Australia (Aug. 11, 2014) (Secretary Hagel), https://dod.defense.gov/News/Transcripts/Transcript-View/Article/606908/joint-press-conference-by-secretary-hagel-and-minister-johnston-in-sydney-austr ("[T]he [P]resident has also made it clear we're going to support the Iraqi security forces in—in every way we can, as they request assistance there."). In addition, as the President has explained, a stable Iraq will permit the United States "to craft [a] . . . joint counterterrorism strategy" with "the Iraqi Government [and] also with regional actors . . . beyond the Middle East." Remarks on the Situations in Iraq and Ferguson, Missouri, and an Exchange with Reporters, Daily Comp. Pres. Doc. No. DCPD201400615, at 4 (Aug. 18, 2014); *see also* John Kerry, U.S. Dep't of State, Press Statement, U.S. Welcomes Important Step in Iraq's Government Formation Process (Aug. 11, 2014), https://2009-2017.state.gov/secretary/remarks/2014/08/230506.htm (emphasizing that "[t]he United States will continue to . . . stand with the Iraqi people in their fight against terrorism"). The President thus had the constitutional authority to rely on a national interest in supporting Iraq, a strategic partner, in ordering targeted airstrikes against ISIL without congressional approval.

### 3.

The third national interest cited by President Obama—relevant in particular to the airstrikes near Mount Sinjar, the Mosul Dam, Amirli, and the Haditha Dam—is an interest in averting humanitarian catastrophe. *See* President Obama August 7 Statement (citing the need to prevent a "potential act of genocide" at Mount Sinjar); August 8 Report to Congress (explaining that the airstrikes around Mount Sinjar were authorized to "protect the civilians trapped there"); August 17 Report to Congress (noting the failure of the Mosul Dam could "threaten the lives of large numbers of civilians"); September 1 Report to Congress (noting that the Amirli airstrikes would "address the emerging humanitarian crisis and protect the civilians trapped" in that town); September 8 Report to Congress (noting the danger to "large numbers of Iraqi civilians"). We believe it was reasonable for the President, in exercising his constitutional authority as Commander in Chief and Chief Executive, to rely on this humanitarian interest, at least in combination with a national interest in protecting American citizens and property or supporting a strategic partner, as a basis for conducting military action without prior authorization from Congress.

The United States places great importance on protecting innocent lives and reducing suffering around the world. In a recent presidential directive, for example, President Obama recognized that "[p]reventing mass atrocities and genocide is a core national security interest and a core moral responsibility of the United States." Office of the Press Secretary, The White House, PSD-10, Presidential Study Directive on Mass Atrocities (Aug. 4, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/08/04/presidential-study-directive-mass-atrocities. Consistent with that interest, the United States has ratified and implemented, through the Genocide Convention Implementation Act of 1987, Pub. L. No. 100-606, 102 Stat. 3045 (1988), the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, which affirms that the contracting parties will "undertake to prevent" genocide and recognizes that "in order to liberate mankind from such an odious scourge, international co-operation is required," *id.* pmbl., art. I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 47, ¶ 165 (Feb. 26) (finding that "the contracting parties have a direct

obligation to prevent genocide"). The United States has also made clear that preventing mass atrocities may in some instances require the use of military force. *See, e.g.*, National Security Strategy 48 (May 2010) ("In the event that prevention fails, the United States will work both multilaterally and bilaterally to mobilize diplomatic, humanitarian, financial, and—in certain instances—military means to prevent and respond to genocide and mass atrocities.").

Consistent with these policies, Presidents have cited humanitarian concerns as an important national interest supporting multiple U.S. military deployments in the past, including those in Haiti in 1994, the former Yugoslavia in 1995, and Libya in 2011. *See, e.g.*, *Letter to Congressional Leaders on Deployment of United States Armed Forces to Haiti* (Sept. 18, 1994), 2 Pub. Papers of Pres. William J. Clinton 1572, 1572 (1994) ("The deployment of U.S. Armed Forces into Haiti is justified by United States national security interests" including "stop[ping] the brutal atrocities that threaten tens of thousands of Haitians[.]"); *Letter to Congressional Leaders on the Deployment of United States Military Forces for Implementation of the Balkan Peace Process* (Dec. 21, 1995), 2 Pub. Papers of Pres. William J. Clinton 1917, 1917–18 (1995) ("I authorized these deployments . . . as part of our commitment to secure the peace and halt the tragic loss of life in the former Yugoslavia."); Office of the Press Secretary, The White House, Letter from the President Regarding the Commencement of Operations in Libya (Mar. 21, 2011) ("Libya Report to Congress"), https://obamawhitehouse.archives.gov/the-press-office/2011/03/21/letter-president-regarding-commencement-operations-libya (notifying Congress of the commencement of operations "to prevent a humanitarian catastrophe").

Indeed, in some past military deployments, a humanitarian purpose appears to have been one of the primary reasons for the President's decision to act. In March 1999, for example, when President Clinton, together with certain NATO allies, launched airstrikes against the Serbian forces and military infrastructure of the Federal Republic of Yugoslavia to protect civilians in Kosovo, humanitarian purposes were the central focus of the mission. As President Clinton weighed his military options in the region, he stated that "[o]ur objective in Kosovo remains clear: to stop the killing and achieve a durable peace that restores Kosovars to self-government." *Remarks on the Situation in Kosovo* (Mar. 22, 1999), 1 Pub. Papers of

Pres. William J. Clinton 426, 426 (1999). And when he announced the airstrikes, President Clinton notified Congress that he was doing so for the principal purposes of emphasizing to Serbian leaders "the imperative of reversing course" in their offensive against civilians in Kosovo; "to deter an even bloodier offensive against innocent civilians in Kosovo; and, if necessary, to seriously damage the Serbian military's capacity to harm the people of Kosovo." *Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro)* (Mar. 26, 1999), 1 Pub. Papers of Pres. William J. Clinton 459, 459 (1999).[13] Two weeks later, President Clinton reaffirmed these objectives when he stated that he would "continue to intensify our actions to achieve the objectives . . . described" in the previous report to Congress, and to "support the international relief efforts being conducted in the region." *Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro)* (Apr. 7, 1999), 1 Pub. Papers of Pres. William J. Clinton 516, 516 (1999). The President underscored the humanitarian nature of the operation by ordering the deployment of forces to Albania and Macedonia "to support humanitarian disaster relief operations for the Kosovar refugees." *Id.* And shortly thereafter, he described his actions in Kosovo and surrounding areas as an effort "to stand against ethnic cleansing, save lives, and bring peace in Kosovo." *Remarks Following a Meeting with Congressional Leaders and an Exchange with Reporters* (Apr. 13, 1999), 1 Pub. Papers of Pres. William J. Clinton 546, 546 (1999).

Similarly, President George H.W. Bush's deployment of more than 25,000 troops to war-torn and divided Somalia during a widespread famine in 1992 was undertaken "to address a major humanitarian calamity, avert related threats to international peace and security, and protect the safety of Americans and others engaged in relief operations." *Letter to Congressional Leaders on the Situation in Somalia* (Dec. 10, 1992), 2 Pub. Papers of Pres. George Bush 2179, 2179–80 (1992–93); *see Address to the Nation on the Situation in Somalia* (Dec. 4, 1992), 2 Pub. Papers of Pres. George Bush 2174, 2175 (1992–93) ("It's now clear that

---

[13] Although the notification to Congress also mentions other concerns—including concerns about regional stability that we cited in our Libya opinion, *see Military Force in Libya*, 35 Op. O.L.C. at 34–35—the notification makes clear that the mission was principally a humanitarian one.

military support is necessary to ensure the safe delivery of the food Somalis need to survive."). In his address to the Nation, President Bush said: "Let me be very clear: Our mission is humanitarian[.]" *Address to the Nation on Situation in Somalia*, 2 Pub. Papers of Pres. George Bush at 2175 (1992–93); *see also* Michael R. Gordon, *Mission to Somalia: U.S. Is Sending Large Force as Warning to Somali Clans*, N.Y. Times, Dec. 5, 1992, at 5 (noting the Pentagon had issued an "official 'mission statement' for the operation, which underscored that the purpose of the intervention is to provide humanitarian aid"). The mission's purpose was thus not simply to protect the American citizens already in Somalia and to "facilitate the safe and orderly deployment of U.N. peacekeeping forces in Somalia," but also "to restore the flow of humanitarian relief to those areas of Somalia most affected by famine and disease." *Military Forces in Somalia*, 16 Op. O.L.C. at 6. In explaining why such an expansive U.S. military action was needed, President Bush emphasized that "[o]nly the United States has the global reach to place a large security force on the ground in such a distant place quickly and efficiently and thus save thousands of innocents from death." *Address to the Nation on the Situation in Somalia*, 2 Pub. Papers of Pres. George Bush at 2175 (1992–93). President Clinton also reiterated the humanitarian nature of the Somalia mission when the deployment ended. *See Remarks on Welcoming Military Personnel Returning from Somalia* (May 5, 1993), 1 Pub. Papers of Pres. William J. Clinton 565, 565 (1993) (noting it was "the largest humanitarian relief operation in history" and that "tens of thousands would have died" if the U.S. had not acted).

While Presidents have often stressed the humanitarian purposes underlying military actions taken abroad, this Office's analysis of these actions has frequently emphasized other relevant national interests, such as regional stability or the protection of American lives. *See, e.g.*, *Military Force in Libya*, 35 Op. O.L.C. at 27 (emphasizing "important U.S. interests in preventing instability in the Middle East and preserving the credibility and effectiveness of the United Nations Security Council"); *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332–33 (emphasizing support for the United Nations and the North Atlantic Treaty Organization, as well as the need to preserve regional stability); *1994 Haiti Deployment*, 18 Op. O.L.C. at 177–79 (highlighting the fact that the operation took place with the consent of the legitimate government). But despite

focusing on other national interests, our opinions have often expressly noted the humanitarian purpose of those deployments. And in so doing, we have never suggested that the goal of preventing humanitarian catastrophes could not be an important national interest supporting the use of military force abroad. *See Military Force in Libya*, 35 Op. O.L.C. at 23, 35; *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 329; *1994 Haiti Deployment*, 18 Op. O.L.C. at 177.

We have also more than once suggested that, when a military deployment is undertaken in part to protect American citizens abroad, its scope can legitimately be expanded to achieve broader humanitarian objectives. In analyzing the legality of the deployment of U.S. forces to Somalia, for example, we began with the national interest in the protection of U.S. persons, *see Military Forces in Somalia*, 16 Op. O.L.C. at 6, but then went on to determine that the President's power to deploy forces abroad was not "strictly limited to the protection of American citizens," *id.* at 11. "Past military interventions," we explained, "extended to the protection of foreign nationals" and "provide precedent for action to protect endangered Somalians and other non-United States citizens." *Id.* (citing, among other examples, President Johnson's ordering of military intervention in the Dominican Republic to "preserve the lives of American citizens and citizens of a good many other nations" and President McKinley's dispatch of 5,000 troops to China during the Boxer Rebellion to rescue the besieged foreign legations, including both U.S. and foreign contingents, in Beijing (internal quotation marks omitted)); *see also Right to Protect* at 65 (troops landed in Uruguay in 1868 "for the protection of foreign residents" generally during an insurrection); *id.* at 120 (troops sent to Nicaragua in 1912 to help the Nicaraguan government protect American citizens and "all inhabitants" of the country during an attempted revolution (internal quotation marks omitted)). We reached a similar conclusion in 2004, determining that "[w]hen the armed forces [we]re deployed [to Haiti] for the protection of American citizens and property, their mission once deployed" did not need to be "so narrowly limited," but rather could extend to the protection of Haitians and other innocent civilians. *2004 Haiti Deployment*, 28 Op. O.L.C. at 32.[14]

---

[14] Although the engagements in Somalia and Haiti had the reinforcement of U.N. resolutions authorizing force, our opinions did not suggest that a President could expand the

In light of these precedents, we believe it was reasonable for the President to rely on a national interest in preventing humanitarian catastrophe, at least in combination with an interest in protecting Americans or supporting an ally or strategic partner, as a justification for conducting airstrikes against ISIL's positions around Mount Sinjar, the Mosul Dam, Amirli, and the Haditha Dam. As discussed above, the President determined that the situation on Mount Sinjar presented "the prospect of violence on a horrific scale," involving "a potential act of genocide" that the United States had "unique capabilities to help avert." President Obama August 7 Statement; *cf. Address to the Nation on the Situation in Somalia*, 2 Pub. Papers of Pres. George Bush at 2175 (1992–93) (noting that, in Somalia, "[o]nly the United States" could "save thousands of innocents from death"). This concern was shared by U.N. officials, who warned that a "humanitarian tragedy [wa]s unfolding in Sinjar." UN Daily News, *UN Warns of "Humanitarian Tragedy" as Militants Seize Town in Northern Iraq* (Aug. 4, 2014), http://www.un.org/News/dh/pdf/english/2014/04082014.pdf; *see also* Security Council August 5 Press Release (expressing "deep concern" about the thousands of Iraqis, many from the Yezidi community, displaced by ISIL and "in urgent need of humanitarian assistance"). Similarly, the failure of either the Mosul Dam or the Haditha Dam could have unleashed flood waves capable of killing large numbers of innocent civilians and endangering or displacing hundreds of thousands of others, in cities from Mosul to Baghdad. *See* August 17 Report to Congress; Mosul Dam Letter; September 8 Report to Congress; NSC September 7 Statement; *see also* Ellison, *An Unprecedented Task*, 63 Int'l Water Power & Dam Construction at 50–51 (noting the failure of the Mosul Dam could potentially kill a half-million civilians). And in Amirli, the President likewise identified an "emerging humanitarian crisis" caused by ISIL's siege of the town, September 1 Report to Congress, an assessment that reflected the State Department's

---

scope of a mission for humanitarian reasons only if a U.N. resolution was in effect. *See 2004 Haiti Deployment*, 28 Op. O.L.C. at 33; *Military Forces in Somalia*, 16 Op. O.L.C. at 7. Moreover, although the U.N. Security Council has not passed a resolution authorizing the use of force in Iraq, it has called on the international community "to support the Government and people of Iraq and to do all it can to help alleviate the suffering of the population affected by the current conflict in Iraq." Security Council August 7 Press Release.

concern about the "dire conditions for the mainly Turkmen population," State Department August 28 Daily Press Briefing, and that was consistent with calls by U.N. officials for "immediate action" to alleviate the "desperate" and "inhuman conditions" in Amirli and prevent a "possible imminent massacre" of the town's citizens, *see* UN News, *Iraqi Civilians Suffering "Horrific" Persecution, Ethnic Cleansing—UN Rights Chief* (Aug. 25, 2014), https://news.un.org/en/story/2014/08/475812-iraqi-civilians-suffering-horrific-persecution-ethnic-cleansing-un-rights-chief; UN News, *Iraq: UN Envoy Calls for Immediate Action to Avert Possible "Massacre" in Northern Town* (Aug. 23, 2014), https://news.un.org/en/story/2014/08/475762-iraq-un-envoy-calls-immediate-action-avert-possible-massacre-northern-town. In all four instances, U.S. airstrikes were designed to help Iraqi and aligned forces prevent the humanitarian catastrophes that were unfolding, either by mitigating ISIL's threat, permitting the delivery of humanitarian aid, or both. Given these circumstances, we think the President reasonably invoked a national interest in preventing humanitarian catastrophe, in combination with a national interest in protecting American citizens and property or supporting a strategic partner, to justify deploying military forces abroad.[15]

## B.

We next consider whether the anticipated nature, scope, and duration of the airstrike operations discussed in this opinion were sufficiently limited so as not to require prior congressional approval under the Declaration of War Clause. As we have previously explained, determining whether a military engagement amounts to a "war" for constitutional purposes involves a "fact-specific assessment of the 'anticipated nature, scope, and duration' of the planned military operations," analyzed in light of the applicable historical precedent. *Military Force in Libya*, 35 Op. O.L.C. at 31 (quoting *1994 Haiti Deployment*, 18 Op. O.L.C. at 179). Here, we

---

[15] Our conclusion addresses only the President's domestic legal authority to engage in such military intervention without prior congressional approval. We do not address the validity of humanitarian intervention as a justification for the use of force under international law. *See, e.g.*, Paul R. Williams et al., *Preventing Mass Atrocity Crimes: The Responsibility to Protect and the Syria Crisis*, 45 Case W. Res. J. Int'l L. 473, 479–80 (2012) (noting the controversy surrounding humanitarian intervention in international law).

believe the anticipated nature, scope, and duration of the operations at issue were sufficiently limited so as not to constitute a "war."

Military actions generally rise to the level of "war" for constitutional purposes only when they involve "prolonged and substantial military engagements, typically involving exposure of U.S. military personnel to significant risk over a substantial period." *Id.* Certain factors reduce the likelihood that a military engagement will amount to a "war" in the constitutional sense. For example, military operations that do not include the introduction of ground troops are less likely to constitute a "war." *See id.* at 38; *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 333.[16] In addition, we have previously suggested that where an "operation does not aim at the conquest or occupation of territory" or seek to "impos[e] through military means a change in the character of the political regime," the operation's more limited aims will likely reduce the risk of resistance to the U.S. deployment and decrease the time needed to fulfill those aims. *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332. Both the lack of ground troops and the more limited goal of an operation also limit the "antecedent risk that United States forces" will "suffer or inflict substantial casualties as a result of the deployment." *1994 Haiti Deployment*, 18 Op. O.L.C. at 179.

Consistent with these principles, we advised in 2011 that the conduct of limited airstrikes and associated support missions in Libya for the purpose

---

[16] We do not mean to imply that contemplated deployments of ground forces—even in substantial numbers—necessarily constitute "wars" for constitutional purposes. For example, in 1994, we concluded that the planned deployment of 20,000 troops to Haiti to oust military dictators and reinstall the legitimate government was not a "war," placing great weight on "the limited antecedent risk that United States forces would encounter significant armed resistance or suffer or inflict substantial casualties as a result of the deployment." *1994 Haiti Deployment*, 18 Op. O.L.C. at 179. And in 1995, we concluded that the planned deployment of about 20,000 ground troops to Bosnia and Herzegovina to ensure compliance with a peace agreement was not a "war." *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332–33. We acknowledged that the deployment of ground troops was "an essentially different, and more problematic, type of intervention" than air or naval operations, because of the increased risk of casualties and the greater difficulty of withdrawing ground forces, but nevertheless found that that concern was outweighed by the fact that the deployment was at the invitation of warring parties to support the agreement they had reached and thus it was "reasonably possible that little or no resistance to the deployment w[ould] occur." *Id.*

of preventing regional instability and preserving the credibility and effectiveness of the U.N. Security Council did not amount to a "war" in the constitutional sense. *Military Force in Libya*, 35 Op. O.L.C. at 37–39. The U.S. mission had at first targeted the Libyan regime's "air defense systems, command and control structures, and other capabilities . . . used to attack civilians and civilian populated areas," and had then shifted to providing support for a NATO-led effort to enforce a no-fly zone and otherwise protect civilians in Libya. *Id.* at 25–26 (internal quotation marks omitted). We compared this operation to two prior campaigns conducted without prior congressional authorization—a series of no-fly zone patrols and periodic airstrikes in Bosnia that had lasted for more than two years prior to the deployment of ground troops in 1995 and a two-month NATO bombing campaign in Yugoslavia in 1999—and concluded that the operations in Libya similarly fell short of requiring a congressional declaration of war. We reached this conclusion in part based on the President's assurance that—as in the air campaigns in Bosnia and Yugoslavia—ground troops would not be deployed, which meant that "[t]he planned operations [would] avoid[] the difficulties of withdrawal and risks of escalation that may attend commitment of ground forces." *Id.* at 38. We also based our conclusion on the "limited means, objectives, and intended duration" of the mission, explaining that the proposed action "did not 'aim at the conquest or occupation of territory,'" but instead was "'in support of international efforts to protect civilians and prevent a humanitarian disaster.'" *Id.* (quoting *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332; Libya Report to Congress).

For similar reasons, we do not believe that the operations addressed in this opinion constituted a "war" in the constitutional sense. President Obama made clear that—aside from a rejected proposal to use ground troops to help extract the trapped Yezidis, *see supra* note 4—the operations would be restricted to airstrikes and associated support missions. "American combat troops," the President explained, "will not be returning to fight in Iraq." Office of the Press Secretary, The White House, Weekly Address: American Operations in Iraq (Aug. 9, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/08/09/weekly-address-american-operations-iraq; *see also* Office of the Press Secretary, The White House, Press Briefing by Principal Deputy Press Secretary Eric Schultz and Deputy National Security Advisor Ben Rhodes (Aug.

13, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/08/13/press-briefing-principal-deputy-press-secretary-eric-schultz-and-deputy- (noting, in response to questions about the possibility of ground troops assisting in an evacuation of Mount Sinjar, that President Obama had "ruled out . . . reintroducing U.S. forces into combat, on the ground, in Iraq"). Thus, like our efforts in Libya, these operations were designed to "avoid the difficulties of withdrawal and risks of escalation that may attend commitment of ground forces." *Military Force in Libya*, 35 Op. O.L.C. at 38.

Moreover, these operations furthered "limited mission[s]" with well-defined and narrow objectives. *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332; *see also, e.g.*, *Military Force in Libya*, 35 Op. O.L.C. at 38. In the airstrikes directed at ISIL positions around Mount Sinjar and Erbil, President Obama directed U.S. military forces to conduct operations that were "limited in their scope and duration as necessary to protect American personnel in Iraq by stopping the current advance on Erbil by [ISIL] and to help forces in Iraq as they fight to break the siege of Mount Sinjar and protect the civilians trapped there." August 8 Report to Congress; *see also, e.g.*, President Obama August 7 Statement (describing the operations' scope and purpose). The later operations against ISIL positions around the Mosul Dam, Amirli, and the Haditha Dam were similarly limited to specific, narrowly defined objectives involving the protection of Americans, assistance to Iraq, and the prevention of humanitarian catastrophe. *See* August 17 Report to Congress (indicating that the President had authorized "targeted air strikes to support operations by Iraqi forces to recapture the Mosul Dam"); September 1 Report to Congress (stating that operations related to Amirli would be "limited in their scope and duration as necessary to address this emerging humanitarian crisis and protect the civilians trapped in" the town); September 8 Report to Congress (indicating the operations would "be limited in their scope and duration as necessary to address th[e] threat [to Haditha Dam] and prevent endangerment of U.S. personnel and facilities and large numbers of Iraqi civilians"). It was thus anticipated that the specific operations at issue would be confined to narrow geographic regions within Iraq and would serve limited and largely "protective purposes" that did "not aim at the conquest or occupation of territory" or "at imposing through military means a change in the character of a political regime." *Proposed Bosnia*

*Deployment*, 19 Op. O.L.C. at 332. Those factors made it less likely that the operations would be of a lengthy duration or that, as a result of the operations, the United States would "find itself involved in extensive or sustained hostilities." *Id.*; *see also 1994 Haiti Deployment*, 18 Op. O.L.C. at 173 (anticipated military operations did not amount to a "war" in part because they "did not involve the risk of major or prolonged hostilities").

Because of the absence of ground troops and the limited nature of the specific missions involved, the anticipated operations discussed in this opinion did not, in our view, amount to a "prolonged and substantial military engagement[] . . . involving exposure of U.S. military personnel to significant risk over a substantial period." *Military Force in Libya*, 35 Op. O.L.C. at 31. We therefore conclude that the "anticipated nature, scope, and duration" of those military operations did not rise to the level of a "war" within the meaning of the Declaration of War Clause.

### III.

For the reasons set forth above, we conclude that President Obama had the constitutional authority to order the targeted airstrike operations against ISIL described above. The President reasonably determined that these military operations furthered important national interests in protecting American lives, assisting an ally or strategic partner at its request, and preventing humanitarian catastrophe; and the anticipated nature, scope, and duration of the operations were sufficiently limited so as not to require prior congressional approval.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*